UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| REVOLUTION LIGHTING TECHNOLOGIES, INC., ROBERT LAPENTA, JAMES DEPALMA DANIEL O'NEAL, and ALLEN GARNER, | |
| Defendants. | |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges the following against Defendants Revolution Lighting Technologies, Inc. ("Revolution") (a Connecticut-based seller of lighting and lighting controls whose stock was publicly traded), its Chief Executive Officer Robert LaPenta, its former Chief Financial Officer James DePalma, and former division-level Chief Financial Officers Allen Garner and Daniel O'Neal, and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1.     Between the end of 2014 and mid-2018, Revolution and Revolution executives LaPenta, DePalma, Garner, and O'Neal falsely inflated the amount of revenue Revolution reported. Revolution published these inflated revenues in financial reports it filed with the Commission, made available to the investing public, and incorporated into a public stock offering. The inflated revenues were also included in public statements by Revolution and its executives. By doing so, Defendants misled investors and potential investors in Revolution by

making it appear that the company was selling more lighting products, and making more revenue, than it actually was.

2.      As detailed below, Revolution's violations of the securities laws were the result of failures, or intentional misconduct, by one or more of the individual Defendants. Each of the individual Defendants aided and abetted at least some of Revolution's violations of the federal securities laws.

3.      Revolution inflated the revenue Revolution reported by fraudulently counting (or "recognizing") revenue from sales that had not been completed, reporting such anticipated sales much earlier than accounting rules and Revolution's own revenue recognition policies permitted. Defendants misrepresented the revenue Revolution had earned by improperly treating uncompleted sales as "bill and hold" transactions. In this manner, Revolution repeatedly recognized revenue from the sale of lighting products before delivering those products to its customers and before Revolution expected its customers to pay for those products. In other words, Revolution routinely recognized revenue from uncompleted sales in which it would "bill" its customers for payment (sending a bill that it did not expect to collect upon until after delivery) and would "hold" the lighting products, if it even had them in stock, for future delivery (often at some indefinite date).

4.      There were criteria under which revenues from bona fide bill and hold transactions could properly be recognized under the United States Generally Accepted Accounting Principles ("GAAP") that were in effect during the times relevant to this case. Similarly, Revolution's written internal accounting policies and procedures required key criteria to be met before revenue could be recognized from bill and hold transactions. Few, if any, of the incomplete sales that Revolution counted as bill and hold transactions met these criteria for

properly recording revenue. Instead, Revolution used bill and hold transactions in an improper way to recognize revenue before it should have done so.

5. Revolution and the other Defendants failed to disclose to investors (or in Revolution's filings with the Commission) Revolution's material deviations from proper revenue recognition practices. Nor did Revolution, CEO LaPenta, or CFO DePalma disclose the company's use of "bill and hold" transactions to record revenue during periodic conference calls with investors and analysts in which they discussed, among other things, Revolution's financial performance (often referred to as "earnings calls"), or in other public statements. By failing to disclose Revolution's heavy reliance on reporting uncompleted sales as bill and hold transactions and by failing to adhere to GAAP and its own accounting policies, Revolution, LaPenta, and DePalma misled Revolution's investors and potential investors. O'Neal and Garner aided and abetted the misleading of investors and potential investors.

6. From the fourth quarter of fiscal year 2014 to the second quarter of fiscal year 2018, Revolution recorded more than 200 purported bill and hold transactions totaling more than $55 million. Revolution frequently recorded these transactions in the final days of the company's reporting quarters, in order to overstate the company's market share, revenue growth, and profitability, as well as to create the false appearance that the company had met or exceeded the financial performance and revenue forecasts it had publicly disclosed to investors and to its bank that it expected to achieve.

7. The push to record bill and hold transactions in order to fill revenue gaps at quarter ends came directly from CEO Robert LaPenta and CFO James DePalma. They pressured sales personnel and successive chief financial officers of Revolution's Value Lighting division, Allen Garner and Daniel O'Neal, to record anticipated future sales of Value's lighting products

as current bill and hold sales and immediately recognize revenue from them. Garner and O'Neal obliged, even though the sales did not meet the revenue recognition requirements to count as bill and hold transactions while the products continued to sit in Revolution's own warehouses.

8.      From the fourth quarter of fiscal year 2014 to the second quarter of fiscal year 2018, Revolution filed at least 30 annual, quarterly, and current reports with the Commission, and issued press releases to the public, that contained material misstatements and omissions concerning the company's sales and revenue recognition practices and financial performance. From fiscal year 2014 to fiscal year 2016, Revolution fraudulently overstated its revenue by more than 6% by fraudulently adding in uncompleted sales, which were improperly recorded as bill and hold transactions.

9.      In May 2016, Revolution incorporated its materially misstated fiscal year 2014 and fiscal year 2015 financial statements into a public offering of 2,775,000 shares of common stock. The revenues reported in these documents were artificially, and fraudulently, elevated because of Revolution's improper recording of bill and hold transactions.

10.     Due to the high risk of abuse and misleading reporting of revenues in the relevant time period, auditors routinely scrutinized the circumstances under which companies recognized sales on a "bill and hold" basis, testing whether various preconditions were satisfied. In connection with Revolution's fraudulent reporting of revenue from uncompleted sales by recording them as bill and hold transactions, Revolution misled its independent auditor and hid the company's revenue recognition practices from it.

11.     Through its conduct, Revolution violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C.S § 77q(a)], and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b),

4

78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

12.     Through his conduct, LaPenta violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C.S § 77q(a)(2) & (3)] and Rules 13a-14 and 13b2-1 promulgated under the Exchange Act [17 C.F.R. §§ 240.13a-14 & 240.13b2-1].   He aided and abetted Revolution's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

13.     Through his conduct, DePalma violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C.S § 77q(a)(2) & (3)], and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 13a-14 and 13b2-1 promulgated under the Exchange Act [17 C.F.R. §§ 240.13a-14, 240.13b2-1].   He aided and abetted Revolution's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

14.     Through his conduct, Garner violated Section 17(a) of the Securities Act [15 U.S.C.S § 77q(a)], and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 promulgated under the Exchange Act [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2].   He aided and abetted Revolution's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

15.     Through his conduct, O'Neal violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C.S § 77q(a)(2) & (3)], and Section 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R. §§ 240.13b2-1]. He aided and abetted Revolution's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

16.     The Commission seeks:

   a.     entry of appropriate permanent injunctions, including an injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws;

   b.     prohibition, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], of Defendant Garner from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o]; and,

   c.     imposition of civil monetary penalties.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(d)(3)(A), 78u(e), and 78aa]. The Commission seeks a permanent injunction pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]. The Commission seeks the imposition of a civil penalty pursuant to 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

18.     Venue is proper in this District because certain of the acts, transactions, practices, and courses of business constituting the alleged violations occurred in Connecticut.

19. Defendants have directly or indirectly made use of the means of instrumentalities or interstate commerce, or the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

20. Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## **DEFENDANTS**

21. Revolution Lighting Technologies, Inc. is a Delaware corporation headquartered in Stamford, Connecticut. Revolution manufactures and markets LED lighting solutions for customers in the industrial, multi-family housing, commercial, and government markets in the United States. Its common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act until August 24, 2020, but during the relevant time period had a class of shares registered pursuant to Section 12(b) of the Exchange Act. Until October 14, 2019, Revolution's securities traded on the NASDAQ (RVLT). On June 29, 2020, the Commission suspended trading in Revolution's securities. On August 21, 2020, the Commission issued an order revoking the registration of Revolution's securities pursuant to Section 12(j) of the Exchange Act effective as of August 24, 2020.

22. Robert LaPenta, age 75, is a resident of Westport, Connecticut. LaPenta is a founding member of Aston Capital, LLC, a private equity firm that owns nearly 50% of Revolution's stock through an affiliate. In September 2012, LaPenta became the Chairman of Revolution's Board of Directors. In January 2013 and July 2015, respectively, he became Revolution's Chief Executive Officer and its President.

23.    James DePalma, age 69, is a resident of New Canaan, Connecticut.  DePalma is a founding member of Aston Capital, LLC.  In September 2012, DePalma was appointed to Revolution's Board of Directors, and in July 2015, he became Revolution's Chief Financial Officer.  DePalma retired from these positions at Revolution in May 2019, but remains a partner of Aston Capital.  From 1973 until 1994, DePalma was an audit partner at a major U.S. accounting firm, and until 1997, he was registered as a Certified Public Accountant in New York.

24.    Allen Garner, age 58, is a resident of Granite Bay, California.  From May 2015 to August 2016, Garner served as the Chief Financial Officer for a division of Revolution called Value Lighting, Inc. As Chief Financial Officer for Value Lighting, Garner had supervisory responsibility for Value's financial statements, general ledger, financial forecasting, and payroll. He had the authority to approve the recognition of revenue for the Value Division and other accounting entries and financial statement information.   He was responsible for certifying Value's quarterly and annual financial statement information to Revolution for inclusion in Revolution's published financial statements and supervised Value's internal controls system.

25.    Daniel O'Neal, age 49, is a resident of Rome, Georgia.  From November 2016 to October 2017, O'Neal served as the Chief Financial Officer for Value Lighting, Inc.  In October 2017, O'Neal became the Chief Financial Officer and Chief Operating Officer of Revolution's Multifamily Division.   As Chief Financial Officer for Value Lighting, O'Neal had supervisory responsibility for Value's financial statements, general ledger, financial forecasting, and payroll. He had the authority to approve the recognition of revenue for the Value Division and other accounting entries and financial statement information.   He was responsible for certifying Value's quarterly and annual financial statement information to Revolution for inclusion in

Revolution's published financial statements and supervised Value's internal controls system. In November 2018, O'Neal was promoted to Senior Vice President and Chief Operating Officer of Revolution. He remains at Revolution in an operational role.

## STATEMENT OF FACTS

### I. Revolution's Business

26. Revolution makes and markets LED lighting solutions for customers in the industrial, multi-family housing, commercial and government markets in the United States.

27. Revolution has several divisions throughout the United States, including Value Lighting, Inc. ("Value"), which Revolution acquired in April 2014. Value was Revolution's largest revenue-producing business. It was often called upon by Revolution's management to increase reported sales when other divisions' sales were lagging.

28. Value is a lighting wholesaler. It took customized orders from general or electrical contractors working large construction or renovation projects. Customer orders often exceeded $100,000 and sometimes exceeded $1 million in lighting material. Once it received a customer's order, Value placed purchase orders, generally with Chinese lighting manufacturers, to manufacture the products. Typically, Value imported the lighting products from China by ocean freighter, and stored the lighting products in its warehouse until the customer authorized delivery to the job site. Historically, Value billed the customer once it shipped the product from its warehouse to the customer, at which point it recognized revenue. To accommodate its customers, who frequently encountered construction delays, Value sometimes stored products in its warehouses for weeks or months before shipping the products and invoicing its customers. Value's business model caused a strain on cash flow because it had to pay its vendors well in

advance of receiving payments from its customers. Because of this cash flow strain, Revolution needed to borrow money from a bank for its operations.

## II.    Bill and Hold Transactions at Value Lighting

29.    By the end of 2014 (a few months after Revolution had acquired Value) Revolution was searching for ways to increase revenue and ease strains on the company's cash flow. Revolution's management, including LaPenta and DePalma, then a Revolution board member, decided Value should record bill and hold sales transactions in an attempt to address both revenue and liquidity problems.

30.    Apart from creating a rosier picture for investors who focused on reported revenue, Revolution's practice of billing customers for unshipped products also enabled the company to borrow more money from its bank. Under the terms of Revolution's revolving credit facility, Revolution could draw more on its credit line once Revolution had billed a customer. Revolution could only borrow up to 20% of the value of its inventory (unsold products), but could borrow 85% of its accounts receivable balance (money owed by customers who had been billed).

31.    If the company's customers had been able routinely to pay for products they had not yet received, this may well have helped address the cash flow problem. As it was, most customers were not able to do so. As a result, sending invoices earlier had no real effect on the company's business or its cash receipts.

32.    Unlike in traditional sales, in recording a bill and hold sale, Value would bill its customer and recognize revenue before shipping the product. A customer's product often arrived from China before the customer was ready to install it on its construction site (and thus before the customer would pay for the product). So billing the customer without shipping the product and then recognizing the revenue based on the sending of that bill accelerated the reporting of

10

revenue, giving the appearance that Revolution had earned more revenue that quarter than it actually had. From year-end 2014 (the fiscal year ended December 31, 2014) through the first half of 2018, Revolution regularly recognized revenue prematurely by reporting numerous uncompleted sales as bill and hold transactions.

33.     When Revolution began reporting revenue based on bill and hold transactions in the fourth quarter of 2014, DePalma (then an audit committee member) researched the GAAP criteria for bill and hold revenue recognition and disseminated them as Revolution's policy for recognizing revenue for bill and hold transactions. He discussed that policy with Value's CEO and with Revolution's Chief Accounting Officer.

34.     Less than three weeks after DePalma disseminated the accounting policy for bill and hold transactions, Value began preparing paperwork aimed at reporting more than 30 uncompleted sales (totaling approximately $4.8 million in revenue—more than 6% of Revolution's total revenue for 2014) as bill and hold transactions. Fourteen of those transactions were reported as taking place on the last day of the fiscal year, December 31, 2014.

35.     The additional improper revenue from bill and hold transactions caused Revolution to report revenue for the fourth fiscal quarter of 2014 "in line with" the revenue expectations it had previously announced. If not for addition of the improper bill and hold transaction revenue, Revolution would have missed its forecasts. Neither Revolution nor its CEO or CFO disclosed to the investing public that Revolution had adopted a practice of reporting revenues for bill and hold transactions or that the practice deviated from GAAP and Revolution's own revenue recognition policies. Nor did they disclose that such reporting of bill and hold transactions had enabled Revolution to meet or exceed the financial forecasts it announced to its investors and its bank.

### III. Revolution's Bill and Hold Scheme Was Pervasive and Persistent

36. After their initial "success" in adding uncompleted sales treated as bill and hold transactions into Revolution's reported revenue in the fourth quarter of 2014, Defendants added revenues attributed to bill and hold transactions in reports for quarter after quarter thereafter. In this way, Revolution reported meeting or beating its revenue forecasts and was also able to borrow up to 85% of the value of those reported transactions from its bank. LaPenta and DePalma repeatedly directed the business units under their direction to book bill and hold transactions. On multiple occasions, Defendants closely monitored and approved bill and hold deals.

37. As Revolution approached the end of each fiscal quarter, LaPenta and DePalma repeatedly requested that salespeople determine whether anticipated future sales could be counted in the current quarter by sending out bills and reporting them as bill and hold transactions.

38. DePalma kept careful track of Revolution's reporting of bill and hold transactions through a "bill and hold schedule" that Garner (and later O'Neal) prepared. DePalma also encouraged the Value executives' use of bill and hold transactions to meet (or to try to meet) quarterly revenue forecasts.

39. In June 2016, for instance, Value's CEO expressly notified DePalma in an email that they would not meet the quarterly revenue forecast without using "a good portion in B&H." DePalma responded, "Let's do what we need to do to get to [the target]."

40. Similarly, in March 2017, O'Neal suggested to Value's CEO and VP of Sales that they begin looking at potential bill and hold transactions "so if we need to consider tapping any projects to meet our number for Q1 it would be best to start talking those jobs that will meet the above [criteria]. My goal is to book none."

41.     In August 2017, LaPenta emailed O'Neal about inventory and sales, noting at one point that Value needed to recognize $3 million in revenue from bill and hold transactions for the quarter to allow Revolution to meet its revenue target.

42.     Within the company, Value and Revolution personnel repeatedly objected to Defendants about the use of bill and hold transactions. Indeed, LaPenta, DePalma, Garner, and O'Neal each expressed reservations about the practice. At times, Revolution personnel, including Defendants, agreed among themselves to wean Revolution off its reliance on characterizing sales as bill and hold transactions to recognize revenue prematurely.

43.     Revolution's heavy reliance on improper bill and hold transactions became a problem in the financial management of the company. Despite the payment terms written on Revolution's invoices, in practice Revolution did not require bill and hold customers to pay for products until after the products shipped. The company then could not collect the resulting receivables on a timely basis because the receivables were based upon the invoice dates and not the shipping dates. Each of the individual Defendants knew that the accounts receivable resulting from the bill and hold transactions grew larger and older each quarter. By early 2017, for instance, O'Neal acknowledged that the company's large balance of accounts receivable dating back to 2015 and 2016 was "the result of tapping jobs completely outside of the guidance of B&H."

44.     Ultimately, the allure of additional sales at quarter end to meet Revolution's publicly announced revenue forecasts and to satisfy investor and analyst expectations trumped concerns that reporting revenue from uncompleted sales by treating them as bill and hold transactions was bad for business. LaPenta and DePalma repeatedly directed Value to identify

customer orders to convert to bill and hold transactions, letting Revolution report higher sales and revenue at the end of Revolution's fiscal quarters.

## IV. Accounting Criteria for Bill and Hold Transactions

45. Under applicable criteria for reporting revenues, bill and hold transactions could only be recognized as revenue under certain conditions. DePalma, Garner, and O'Neal knew this, and LaPenta knew there were criteria without fully understanding all of the criteria.

46. Under GAAP at that time (prior to 2018), revenue could not be recognized until it was earned (generally speaking, when goods or services are transferred or rendered) and realizable (generally speaking, when cash or a claim to cash is received in exchange for goods or services).

47. On paper, Revolution's accounting policy was to recognize revenue "upon shipment or delivery to our customers in accordance with the respective contractual arrangements, provided no significant obligations remain and collection is probable. For sales that include customer acceptance terms, revenue is recorded after customer acceptance…." Revolution published this revenue recognition policy in each of its Form 10-K filings with the Commission during the relevant time period.

48. For bill and hold arrangements—sales where "shipment or delivery" had not yet occurred—Revolution's internal accounting policy allowed for revenue to be recognized only if all of the following criteria were met:

  i. the risks of ownership have passed to buyer;
  ii. there is a fixed commitment to purchase the products by the buyer;
  iii. the buyer, not seller, must request the transaction and have a business reason for the bill and hold;
  iv. there is a fixed delivery date;
  v. there is no seller performance outstanding;

vi.    the goods are segregated from other inventory and are ready for shipment.

49.    Revolution's policy closely tracked the bill and hold accounting guidance in the Commission's Staff Accounting Bulletin 104, and management considered the company's policy to comply with GAAP.

50.    DePalma knew the bill and hold accounting criteria and policy because he developed and disseminated the policy in 2014. Garner was given a copy of the policy and criteria shortly after he started with Revolution, was tasked to apply them, and was later directed by DePalma to create Value's standard operating accounting procedure for bill and hold transactions. Shortly after O'Neal started with Revolution in November 2016, O'Neal, likewise, was informed of the bill and hold accounting criteria Value nominally used to evaluate bill and hold transactions and was tasked to apply them. LaPenta understood that Revolution had a policy and was aware of some of the accounting criteria of Revolution's policy.

51.    Revolution (and Value) claimed in communications with its auditor and its bank to follow the required criteria in bill and hold accounting when recognizing revenue, and to have established internal controls to ensure compliance with the revenue recognition rules. But, time after time, Revolution's bill and hold transactions failed to meet the criteria required for proper revenue recognition under GAAP and Revolution's own revenue recognition policy.

52.    While significant amounts of Revolution's reported revenue came from recording bill and hold transactions, Revolution did not disclose that it was recognizing revenue from bill and hold transactions in any of its quarterly or annual filings with the Commission, or elsewhere, at any time between 2014 and mid-2018. Nor did LaPenta or DePalma disclose the recording of bill and hold transactions in any earnings call, press release, or other communication with investors or the public during that time.

53.     Defendants LaPenta, DePalma, Garner, and (later) O'Neal each had responsibility for presenting and reporting accurate financial information for Revolution and Value. Each of them knew or should have known of the criteria for recognizing revenue for a bill and hold transaction before approving these transactions. In fact, DePalma emailed subordinates about these criteria immediately before the beginning of Revolution's use of bill and hold transactions in 2014, and eventually both Garner and O'Neal were informed of these accounting criteria and Revolution's own revenue recognition policy for bill and hold transactions.

54.     Defendants LaPenta, DePalma, Garner, and O'Neal each knew or should have known that Value's accounting practices for bill and hold sales failed to satisfy Revolution's written accounting criteria or GAAP. Each knew or should have known that, in the vast majority of uncompleted sales that were treated as a bill and hold transaction and where revenue was recognized by Revolution: (1) Revolution (and particularly Value employees) initiated the bill and hold transactions, not the customer; (2) Revolution did not require customers to pay until products were shipped to the customers; and (3) the transactions lacked a fixed delivery date. And each knew or should have known that for some of the reported bill and hold transactions: (1) Revolution had not completed its performance obligations; (2) the goods were not segregated because Revolution did not have physical possession of the products when revenue was recognized (as when goods were still in transit from China); and/or (3) Revolution had not received from its customers a fixed commitment to purchase the goods.

55.     Although the anticipated sales that were recorded as bill and hold sales failed to meet the criteria required for proper revenue recognition under GAAP and Revolution's own revenue recognition policy, LaPenta, DePalma, Garner, and O'Neal continued to direct the

recording of bill and hold transactions, typically to meet revenue forecasts. As a result, Revolution prematurely recognized revenue from these incomplete sales.

## V. Revolution Repeatedly Recognized Revenue from Bill and Hold Sales that Did Not Satisfy the Accounting Criteria

### A. Revolution Recognized Revenue from Bill and Hold Sales that Were Not Requested by Customers and/or Where Revolution Did Not Require Payment Until After It Shipped the Products

56. Revolution's accounting policy stated that the buyer (not Revolution) must request the bill and hold transaction and have a business reason for it. The policy also stated that there could be no seller (Revolution) performance outstanding for revenue to be recognized.

57. But, contrary to policy, Value employees routinely initiated the bill and hold transactions and Revolution did not, as a practical matter, require customers to pay for the products until they were shipped to the customers. Revolution recognized revenue from these transactions nonetheless.

58. Beginning in late 2014, Value employees (at Revolution's direction) repeatedly proposed bill and hold transactions to customers. Given that Value's pre-existing practice had been to wait to ship products until customers were ready to install them on job sites, the bill and hold arrangements presented no benefit for customers. By sending bills to customers months before the customers were ready to install the products (or had the funds to pay for the products), bill and hold arrangements arguably placed customers in a worse position.

59. To artificially support Revolution's premature recognition of these sales under the bill and hold accounting criteria, Value employees asked customers to sign "stored materials agreements." Revolution drafted the agreements to provide to its auditor and bank to make it appear these sales met the criteria for revenue recognition. Revolution's initial attempts to draft the letter agreements were in DePalma's view "deficient." DePalma directed Revolution to re-

draft the letters to make "clear that the customer has requested the bill and hold" even though he knew or should have known that customers had not requested the bill and hold arrangements.

60.    As a result of DePalma's direction, Revolution, including Garner, re-drafted the stored material agreements to include conclusory customer representations that tracked the accounting criteria for bill and hold transactions, but typically did not accurately reflect the true nature of the transactions.

61.    To entice the customers into signing this paperwork, Revolution offered customers a "stored materials discount" of 3% to 5% if they agreed to sign the stored materials agreement.

62.    LaPenta, DePalma, Garner, and O'Neal knew that discounts were offered to bill and hold customers. Such discounts were tracked on Value's "bill and hold schedule," a document that was prepared at different times by Garner and O'Neal and sent to DePalma.

63.    In many instances, customers neglected or declined to sign stored materials agreements. On multiple occasions this happened when Revolution had already recognized revenue on transactions with those customers. In some cases, months passed after Revolution had recognized revenue without having secured a stored materials agreement and without having shipped any products to the customers. When months passed after a quarter end and customers still had not agreed to bill and hold arrangements associated with revenue that Revolution had already recognized, Value personnel became even more aggressive. For example, during the fourth quarter of 2015, Revolution recognized approximately $320,000 in revenue from a customer ("Customer X"). In January 2016, Garner emailed DePalma a list and status update of all of the bill and hold transactions from which Value had already recorded revenue. The update indicated that two transactions lacked purchase orders, but that Revolution had recorded the

revenue anyway. The update also indicated that, long after the fiscal quarter had closed, multiple customers had yet to agree to the bill and hold arrangements that formed the basis for Revolution recognizing the revenue. This included Customer X. Garner's email to DePalma explained that the Customer X transaction was a "last minute sale" and the process was "very early on." Less than two weeks later, in February 2016, a Value sales manager forwarded DePalma, Garner, and others an email detailing his negotiations with Customer X as he pursued the stored materials agreement. The email indicated that Value first proposed the bill and hold arrangement to Customer X on February 1, 2016, after the close of the fourth quarter, and in February did not possess the inventory to sell to Customer X. In addition, it showed that Value offered to pay for insurance at twice the value of the sold product, on top of the standard 3%-5% discount. Thus, both DePalma and Garner were informed that the revenue figures they had approved for Revolution's fourth quarter 2015 earnings report included revenue from a deal that was proposed and still being negotiated more than a month after quarter close. Neither DePalma nor Garner did anything to correct the earnings report. Indeed, when the stored materials agreement was finally signed at the end of February 2016, DePalma merely cautioned Garner that the agreement date should align with the December 2015 invoice date, even though both knew the customer had only agreed to the bill and hold arrangement and signed the paperwork in February.

64. Value's sales staff routinely informed customers that they did not need to pay for the product until it was shipped, instead of obligating them to pay when billed or invoiced according to Revolution's normal payment terms. This practice violated Revolution's accounting policies because Revolution still had performance obligations (shipping the product to the buyer) before the customer was obligated to pay. LaPenta, DePalma, Garner, and O'Neal

knew that, in practice, customers were not expected to pay until the product was shipped to the customer.

### B. Revolution Recognized Revenue from Bill and Hold Sales that Did Not Have a Fixed Delivery Schedule

65.     Revolution's written revenue recognition policy required bill and hold transactions to have a fixed delivery date. But Revolution regularly and improperly recognized revenue for purported bill and hold transactions that lacked a fixed delivery date or schedule.

66.     The stored materials agreement that Revolution created to make recognition of revenue from bill and hold transactions appear legitimate stated: (a) that the customer "request[s] Value Lighting invoice us for the above referenced job based on preliminary shipping schedules, but not ship the goods and services covered by such job, until further notice"; and (b) that "[d]eliveries will be shipped according to customer's job release schedule…" In other words, instead of setting a fixed delivery schedule, Revolution routinely agreed to hold products until further notice from its customers.

67.     LaPenta, DePalma, Garner, and O'Neal all received multiple copies of the stored materials agreement. They understood from their employees that shipping dates for bill and hold products were open-ended. At various points, LaPenta and DePalma requested Value provide them with estimates when Value thought bill and hold transactions would ship. Often, Value staff would respond either that Value did not have any estimate of the shipping date, or that the shipping date was uncertain and months in the future. Defendants were thus explicitly informed that, in practice, multiple transactions for which revenue was recorded did not have fixed delivery schedules.

68.     For example, in December 2015, Garner admitted internally in an email that Revolution categorically lacked a "scheduled delivery date" for its bill and hold sales. Garner

wrote that delivery dates were never committed to with any orders. Nonetheless, Garner continued to approve the recognition of revenue from bill and hold deals when the deals lacked scheduled delivery dates, including more than $10.6 million in revenue in the fourth quarter of 2015.

### C. Revolution Recognized Revenue from Bill and Hold Sales that Did Not Have Any Written Commitment from the Customer

69. As a condition for recognizing revenue from bill and hold transactions, Revolution's accounting policy required a written commitment from the customer. Under Revolution's written bill and hold policies, the purchase order together with a stored materials agreement or similar agreement was intended to satisfy this criterion. Yet, Revolution regularly recorded revenue on bill and hold deals well before it received these written commitments from customers to purchase the products.

70. Value regularly did not receive executed stored materials agreements before the close of the fiscal quarter. LaPenta, DePalma, Garner, and O'Neal all understood that each quarter many of the stored materials agreements were not executed before the end of the fiscal quarter. They all knew Value sales personnel routinely negotiated with some customers after quarter end to persuade them to execute stored materials agreements. Despite this practice, LaPenta, DePalma, Garner, and O'Neal did not object to recognizing the deals as bill and hold transactions. Instead of following Revolution's written accounting policy and GAAP, they were concerned with whether recognizing revenue from the uncompleted sales would get past the auditor. LaPenta, DePalma, Garner, and O'Neal focused on whether Revolution had in hand the signed agreements before the auditor finished its audit, particularly when the auditor requested to review a particular transaction. Otherwise, when or whether Revolution received a stored

materials agreement was without consequence and would not affect the finance department's revenue recognition.

71.      In one instance in May 2016, Garner discussed with another Value employee a bill and hold transaction that had been selected by Revolution's auditor for review. The employee told Garner that Revolution still did not have the stored materials agreement, which was required under Revolution's written policy to recognize revenue from the bill and hold transaction, even though Revolution had already recognized the revenue from that transaction in a previous quarter. When DePalma got involved in the email discussion, he instructed the Value staff that "under no circumstances" would they record revenue on bill and hold transactions that did not have signed stored materials agreements, "unless approved by Garner and [Value's CEO]." In his email, he directed the Value staff to notify him where those exceptions were made, and required "corporate approval" if the "aggregate outstanding amount of B&H exceeds $1 million." Value's CEO reminded DePalma that, "Before this goes too far, think this was the one I told you might not happen, yet we invoiced anyway in December…." DePalma wrote back, "I can't do anything about the past. I'm looking to installing proper procedures." Revolution did not reverse the recognition of revenue on this transaction, and neither DePalma nor Garner directed it to do so.

72.      In an email in late 2016, DePalma explained to Value's CEO, O'Neal, and others that DePalma would "decide on facts and circumstances" whether to recognize revenue from bill and hold transactions when Revolution did not have stored materials agreements signed by customers. Not once during his tenure as CFO of Revolution did DePalma reverse a bill and hold transaction on the basis that there was no stored materials agreement signed by the customer before the end of the quarter. Instead, when faced with such situations, DePalma merely

pressured Value's personnel to get the customers to sign stored materials agreements before the auditor's review was complete.

73.    In some instances, Revolution recorded sales from bill and hold transactions without any written commitment from its customers even to buy particular lighting products. In several instances, Revolution recorded bill and hold transactions, and included those transactions in its reported revenue, before the customers in question had even submitted purchase orders or otherwise committed to buying the products.

74.    In one instance, on October 30, 2015, Value recorded revenue of over $229,000 with no purchase order or stored materials agreement from the customer. In January 2016, Garner and DePalma learned that Revolution's independent auditor had requested the purchase order for this transaction in connection with its 2015 revenue testing. Garner and DePalma also learned that Value still did not have any purchase order or stored materials agreement. Nearly six months after it had recorded revenue for this nonexistent sale (April 2016), Value confirmed that its customer was cancelling the job and would not place an order.

75.    Similarly, in January 2016, DePalma learned in an email from Garner that Revolution recognized revenue in connection with a purported bill and hold transaction, even though Revolution had no purchase order from the customer. Revolution recognized approximately $177,000 on December 31, 2015 even though it had no documentation of a sale. When the customer finally delivered a purchase order to Value in July 2016, the Value sales manager informed DePalma, Garner, and others by email that he believed the stored materials agreement was "coming." Despite knowing this transaction should not have been recognized in December 2015, neither DePalma nor Garner attempted to reverse or adjust the revenue improperly recorded.

76. In another instance, in January 2016, DePalma approved Revolution's recognition of approximately $142,000 of revenue in connection with a purported bill and hold transaction, even though he knew that Revolution had no purchase order from the customer. When Revolution's independent auditor asked for the written stored materials agreement for this bill and hold transaction, Garner lied to the auditor by stating that Revolution could not *find* the signed agreement. In actuality, he knew no agreement existed. Garner knew that the customer would not sign an agreement because it had never ordered the products in the first place. Meanwhile, in internal discussions, Garner recommended reversing this sale. In mid-July 2016, Garner emailed DePalma that he had been telling the auditor for months that Value staff was working on *locating* the stored materials agreement that since at least early May he and DePalma both knew did not exist.

77. During that email exchange in mid-July 2016, Garner recommended to DePalma that Revolution reverse the revenue recognized in January 2016 because the customer had never submitted a purchase order, let alone signed a stored materials agreement, and ultimately the customer decided not to order any products. Garner recommended reversing the sale – that is, making an accounting entry that would reflect the fact that no sale had occurred. Garner alerted DePalma that the non-existent sale would be subject to review because Revolution's auditor "had flagged this one" in its prior review. DePalma rejected Garner's recommendation to reverse the sale and suggested that instead Revolution should treat the matter as if a customer had simply failed to pay for a product it had received, by "charging the bad debt off against the a/r [accounts receivable] reserve." When Garner countered that they could not treat the transaction in the way DePalma had instructed, DePalma told him, "We can discuss but I don't believe we can go back to a prior period and reverse a sale (an error)." DePalma, who had spent 20 years as an auditor

and audit partner at a leading national audit firm, knew or should have known that the accounting treatment he directed for this matter was false and misleading, and that his assertion that the company was somehow unable to correct erroneous accounting entries in previous quarters was incorrect.

78.　　In late June 2016, LaPenta directed Garner to have Value recognize revenue by recording bill and hold transactions in the quarter ended June 30, 2016, even without purchase orders and stored materials agreements, so long as the salespeople could obtain those documents by July 15, 2016 (more than two weeks after the close of the fiscal quarter).

79.　　At the beginning of December 2016, O'Neal emailed DePalma about several issues, including instances where bill and hold transactions had been recorded and were now having an impact on Revolution's accounts receivable. O'Neal identified $200,000 to $300,000 of "pre-bill" (bill and hold transactions) that were "no longer valid," that is, bill and hold transactions that had been recorded for sales that still had not been completed or that were not expected to be completed at all. He also identified $400,000 or more in "pre-bill discounts" (discounts given to customers to induce them to sign stored materials agreements), that is, transactions in which the original sales prices had been recorded, even though those were no longer the amounts the customers actually owed. O'Neal alerted DePalma that the discounts were "given and still in AR [accounts receivable]." Instead of instructing O'Neal to reverse the revenue recognized from the invalid transactions, DePalma again inquired about the "A/R reserve," a category that would only properly be used when there were difficulties collecting payment from customers on legitimate sales.

80.　　By the end of the quarter, December 31, 2016, O'Neal had authorized recording the revenue from nine bill and hold transactions, even though he was aware that the purported

purchasers had not submitted purchase orders or otherwise committed to buying the products. For at least one of the nine transactions, totaling $147,000, the customer never submitted a purchase order. Revolution recognized revenue from that uncompleted sale based only on a price quote a Revolution salesperson had provided to a customer, even though the customer had not yet committed to order. Even six months later, in June 2017, the customer still had not submitted a purchase order or otherwise committed to buying the products. Yet Revolution did not alter its recognition of the revenue from this transaction.

81.     O'Neal was aware, and explicitly alerted DePalma, that Revolution's practices with respect to recognizing revenue by recording bill and hold transactions were directly at odds with its procedures. In a December 8, 2016 email to staff, O'Neal wrote, "orders that we chase today that do not meet our SOP. To Jim [DePalma]'s point there is flexibility however we've stretched this flexibility now beyond the conditions to record such transactions in certain cases…. The fact we are still chasing letters from 3Q … goes against the very premise of our ability to have booked it in the first place. We have several and I'm asked routinely by the auditors. Of course they wonder why we aren't able to provide….FYI we may be in a position of having to reverse prior ones. Not good." Copying LaPenta and others, DePalma responded, "All good points." O'Neal then wrote to DePalma directly about the sales staff, "[t]hey have a number of these in mind already and several do not meet our criteria." Despite acknowledging the discrepancy between Revolution's actual accounting practices and its policies, neither O'Neal nor DePalma directed any reversals in Revolution's reported revenues.

82.     In January 2017, DePalma and O'Neal again considered what to do about uncompleted sales that had been recorded as bill and hold transactions and for which revenue had already been recognized, where the customers had not agreed to the transactions and had

ultimately canceled their orders. O'Neal told DePalma that it would "be difficult to write up the credits again to AR for 2016" as they came from "most importantly B&H sales that were canceled. No longer legit." O'Neal offered, "I can find a home for them in 2016 but can do so outside of Sales if I can support below GM [gross margin]." DePalma instructed O'Neal on the accounting for the illegitimate transactions: "Credit revenues and up an asset account for a/r reconciling items. Set up reserve for 90% of the asset account and charge misc charges below the line." In other words, DePalma and O'Neal discussed using improper accounting to avoid revising the amount of revenue Revolution had previously reported and to conceal that Revolution had booked revenue from uncompleted sales that never came to fruition. DePalma later admitted during sworn testimony with the Commission's staff that his answer was "not good accounting" because the revenue should have been reversed. Ultimately, O'Neal did not credit revenues or set up an asset account for receivables in connection with any of these transactions as DePalma had suggested.

83.     Two months later, in February 2017, O'Neal told DePalma that the "Entire business model [was] built on B/H and there is a sales/PM/Ops process breakdown" which "doesn't get fixed with more procedures. Leadership, accountability and understanding how to run an effective business….. More B&H in this business will have significantly negative impacts to the organization."

84.     Yet Revolution continued to improperly record bill and hold transactions, including recording deals without any real substance. In early 2017, O'Neal himself permitted Value to record revenue in fiscal year 2016 from at least seven bill and hold transactions for which he knew Value had not received purchase orders by February 2017 -- over a month after year-end close.

85.     In late June 2017, O'Neal emailed others at Value that he had calculated that revenue from some of those deals needed to be reduced by $650,000 because the purchase orders Revolution finally received from its customers differed significantly from the revenue amount Revolution had recorded for fiscal 2016. In addition, at least one customer had not ordered any product by June 21, 2017. Nevertheless, O'Neal did not recommend reversing the revenue recognized in 2016 from these uncompleted sales and recording them in the proper quarter.

### D. Revolution Recognized Revenue from Bill and Hold Sales Even Though Goods Were Not Segregated from Other Inventory or Ready for Shipment

86.     Revolution's written accounting policy required that products in bill and hold transactions must be segregated from other inventory and be ready for shipment. Yet Revolution improperly recognized revenue by recording bill and hold sales for products that were still in transit from China. Product in transit from China was neither segregated nor ready for Revolution to ship to its end customers, and so failed these criteria. By the same token, such transactions did not qualify for reporting as completed sales since Revolution had not completed all of its obligations to the purchasers.

87.     Nonetheless, LaPenta, DePalma, Garner, and O'Neal approved revenue recognition for bill and hold transactions in which the product was in-transit from China.

88.     In one instance, on December 21, 2016, O'Neal emailed Value's CEO saying that he had spoken with DePalma "to get clarification on what can be booked as B&H this month." Based on DePalma's clarification, O'Neal reported that Value would recognize revenue for bill and hold deals when the product was "in-transit (on the water which can be verified)."

89.     Later, in January 2017, O'Neal calculated that Revolution was recognizing $3.3 million in revenue in the fourth quarter of 2016 (the quarter ended December 31, 2016) on sales

product that was still in transit and that 47% of Value Lighting's fourth quarter of 2016 revenue came from transactions that had been recorded as bill and hold sales.

90.     In March 2017, O'Neal directed that four sales be treated as bill and hold transactions and over $1.1 million in revenue be recognized from those sales, even though he knew that Revolution only had a small fraction of the ordered products actually in its warehouses. A month later, after receiving an invoice from Revolution, one customer asked for photographs of the products for insurance purposes. Revolution's accounting personnel claimed Revolution had made an error with its inventory, and told the customer to disregard the invoices that Revolution had sent. But Revolution continued to recognize the revenue nonetheless.

91.     In July 2017, O'Neal instructed Value's accounting personnel to create invoices for sales that had already been recorded as revenue in the previous quarter. Revolution had recorded the revenue for products in inventory and items still "in-transit" from the vendor. One of the Value accounting employees asked his colleagues, "Can you please explain how this isn't unethical? I am not comfortable invoicing for material we do not have." The Controller responded, "this is being pushed down and approved from the RVLT directors (i.e., Mr. LaPenta) based on our liabilities from the vendors and ownership of inventory in transit."

92.     Later, in an August 2017 email, the Controller confirmed with O'Neal that they were recognizing revenue from sales of products that were "on the water."

## E. Revolution Recognized Revenue from Bill and Hold Sales Where Revolution Did Not Transfer Title and/or Risk of Loss to the Customer

93.      Revolution's written revenue recognition policy required that Revolution transfer to the customer title to the goods sold and the risk of the loss of those goods, before revenue could be recognized for a bill and hold transaction. In practice, Revolution knowingly violated

this requirement in multiple instances, recognizing revenue for transactions in which the customer had not agreed to accept the title or risk of loss to the products in question.

94.     In 2014, for instance, Revolution improperly recognized revenue from a particular customer, when the customer expressly refused to accept title to products on bill and hold deals until Revolution shipped the product. Revolution did not ship the products until after the close of the fiscal year, and so should not have recognized the revenue in 2014. In February 2015, DePalma (who was a member of Revolution's Audit Committee at that time) learned that the customer refused to accept title and that Revolution should not have recognized revenue. Yet he took no action and instead approved the filing of Revolution's Form 10-K for the year ending December 31, 2014, when he knew or should have known that revenue was improperly recognized.

95.     Similarly, in the fourth quarter of 2015, Revolution recognized revenue from an uncompleted sale to one of its customers. Six weeks after the quarter close, the customer signed a stored materials agreement. The agreement had a typed date of December 28, 2015, and the customer handwrote the date when he signed on February 8, 2016. In the agreement, Value "acknowledge[d] that it will insure the stored materials for their full value and bear the risk of loss of same until such time as the materials are delivered to" the customer. In other words, there was no transfer of the risk of loss of the goods to the customer. Garner also personally directed that the dates on the stored materials agreement be altered to align with the date of the invoice Value sent to the customer. Garner's subordinate then changed the typed date of the agreement to November 30, 2015 and deleted the customer's handwritten date of February 8, 2016. Garner reviewed the altered agreement before he forwarded the agreement to Revolution's treasurer.

## VI.  Revolution Misled its Independent Auditor

96.  Revolution and certain of its executives misled Revolution's independent auditor about various aspects of Revolution's practice of recording uncompleted sales as bill and hold transactions that, if revealed, should have informed the auditor that Revolution had improperly recorded revenue in this manner.

97.  In March 2015, for instance, Revolution's auditor presented its findings to Revolution's Audit Committee.  The auditor's presentation reflected that the auditor had been told that "customers requested the bill and hold arrangements in anticipation of the upcoming Chinese New Year and shortage of supply from China."  Two months later, Revolution's story had changed.  Shortly after Garner's arrival at Value, Revolution's lender sought to confirm the validity of Revolution's reported receivables.  Garner, DePalma, and another Revolution senior officer collaborated on a call and developed a new explanation of the bill and hold transactions.  Following the call, Garner circulated to DePalma and the other senior officer a proposed written response to the bank explaining that the bill and hold transactions had been requested by the customers as a "result of weather related matters and problems with shipments coming through US ports" as well as "an overall labor shortage in the construction workforce."  DePalma reviewed the explanation intended for the bank and responded, "Excellent."  These explanations were false; in reality, Revolution had proposed and initiated the paperwork that was designed to treat incomplete sales as bill and hold transactions in order to fraudulently inflate the revenues the company reported each quarter.

98.  Revolution's stored materials agreements were drafted to make it appear to the auditor that the company's reported bill and hold transactions met certain revenue recognition criteria, including that the transactions were done at the customers' requests; that the customers accepted ownership of the products; that the customers understood that the products would be

segregated from other inventory; that Revolution had completed its performance obligations to the customers; and that the customers agreed to pay the invoice in the normal collection process. In reality, most of the bill and hold transactions did not meet one or more of these criteria.

99.     In late February 2016, DePalma knew that a significant number of stored materials agreements had been signed and dated by customers weeks or months after Revolution had recognized revenue. Revolution had recognized the revenue for these transactions in the quarter ended December 31, 2015. DePalma warned Garner, Revolution's Controller, and Value's CEO, "[b]e careful with the dates [;] should be consistent with the invoice date."

100.    Garner forwarded this warning to an employee in the accounting department saying, "FYI – not sure how we handle the date issue – maybe we can do some creative editing of the dates on these [agreements]? Let me know if you can figure out how to get the right dates on these last ones?"

101.    Several days later, Garner instructed an employee to alter nearly a dozen stored materials agreements. He emailed her and explained that the dates on the executed stored materials agreements needed to reflect the dates of Revolution's invoices issued to those customers. He directed her to "adjust" the dates on the agreements if they did not match the invoice date. Performing a "date update" involved updating the typed date of the agreement and changing or eliminating the dates handwritten by the customers next to their signatures.

102.    For example, Revolution had invoiced a customer for a bill and hold transaction on December 29, 2015. The customer was presented with the stored materials agreement, dated January 18, 2016, by email on February 1, 2016. The customer returned it signed on February 26, 2016. A Revolution accounting employee then changed the typewritten date of February 26, 2016 to December 28, 2015, removed the customer's handwritten date of February 26, 2016, and

replaced it with a handwritten date of December 28, 2015.  In response to the auditor's request to review agreements supporting specific transactions under review, Garner provided this and other altered agreements to the independent auditor in connection with the year end 2015 audit.

103.    Garner provided stored materials agreements with similarly forged dates to the auditor in connection with the auditor's review of bill and hold transactions during its first quarter 2016 review.  Garner knew or should have known that each of the altered stored materials agreements might be examined by Revolution's auditor.

104.    Garner misled the auditor in May 2016 about the existence of a signed stored materials agreement from a customer to support revenue from a supposed bill and hold transaction.  He told the auditor that the bill and hold arrangement was agreed to verbally and that Revolution was trying to find the stored materials agreement.  In reality, as Garner knew, the customer had never ordered product with a purchase order (meaning Revolution had not ordered the product from its vendors) and no stored materials agreement was ever executed.  In mid-July 2016, Garner emailed DePalma and informed him that he had misled the auditor about the existence of the agreement, but neither Garner nor DePalma did anything to correct these false statements to the auditor.

105.    In February 2018, DePalma wrote a memorandum to Revolution's auditor "to document the effect of bill and hold transactions and the potential impact on reported financial results and internal controls."  The memo responded to questions from Revolution's auditor about Revolution's recognition of revenue from transactions Revolution had maintained were valid bill and hold sales going back to 2014.  The auditor asked DePalma to assume that the revenue from the bill and hold transactions was not properly recognized, and to calculate the impact of reversing those sales.  DePalma's memo represented that:

    i.  "Revolution had provided guidance to Value Lighting and the organization to ensure that bill and hold sales met the requirements of general accepted principles [sic] ("GAAP")…."

   ii.  "[Value] confirmed periodically and annually, as part of the annual audit examination, that the proper accounting was being followed."

  iii.  "During [O'Neal's] review [of inventory control, billing and collections], it was noted that while Value Lighting followed the aforementioned guidance regarding bill and hold transactions, the fixed delivery dates were not always adhered to by the customer."

These representations were misleading. Whatever may have been Revolution's written policies, those written policies did not reflect its actual accounting practices in reporting uncompleted sales as bill and hold transactions. In particular, by citing *customer* failure to adhere to fixed delivery dates, the memo omitted the fact that Revolution routinely disregarded various criteria set forth in its written policies and repeatedly reported uncompleted sales as bill and hold transactions in order to inflate its reported revenues.

## VII. The Improperly Recognized Bill and Hold Transactions Resulted in Material Misstatements

106. Revolution's improper recording of revenue based on bill and hold transactions resulted in material misstatements to Revolution's financial statements, including its Forms 10-Q and 10-K between 2014 and 2018. The impact of these misstatements is shown below:

| *In 000s (except percentages)* | FY 2014 | FY 2015 | FY 2016 | FY 2017 | 1st Half 2018 |
|---|---|---|---|---|---|
| Revenue As Reported | 76,840 | 129,656 | 172,121 | 152,312 | 70,183 |
| Bill & Hold Adjustments | (4,769) | (5,912) | (11,314) | 17,546 | 1,400 |
| Revenue As Adjusted for Bill and Holds | 72,071 | 123,744 | 160,807 | 169,858 | 71,583 |
| Misstatement as % of Adjusted Revenue | 6.6% | 4.8% | 7.0% | -10.3% | -2.0% |

107. Revolution's misstatements of revenue exceeded the 1% quantitative materiality threshold used by its auditor. The improper recording of bill and hold revenues enabled Revolution to report figures that were "in line with" previously reported revenue forecasts for the fourth fiscal quarter of 2014 and narrowly beat revenue forecasts for the year-end 2015. These results were particularly significant when Revolution made a public offering of common stock in May 2016.

108. Revolution's operating income was also overstated by more than 60% for fiscal year 2015 and by more than 190% for fiscal year 2016.

109. On July 25, 2018, Revolution filed with the Commission its Form 10-Q for the quarter ended June 30, 2018. At that time, Revolution knew that the Commission was investigating the company's accounting practices. For the first time, Revolution's filing with the Commission disclosed to investors that the company had been reporting revenues based on recording bill and hold transactions. That Form 10-Q also disclosed the company's material weakness in its controls associated with bill and hold transactions.

110. Despite these disclosures, Revolution improperly recognized revenue from bill and hold transactions in the second quarter of 2018 and misstated its financial statements in its Form 10-Q for that quarter.

111. On October 19, 2018, Revolution first publicly disclosed the existence of the Commission's investigation and reported its estimates of the net effect on the reported revenue for its fiscal years from 2014 through 2017. Revolution's stock price declined by as much as 9.3% as a result of the announcement.

112. Revolution's misrepresentations of its revenue and operating income in its periodic filings with the Commission between 2014 and mid-2018 were material misstatements.

113.    Revolution's failure to describe or discuss its recording of bill and hold transactions and its deviation from GAAP and its own stated and internal revenue recognition policies in its filings with the Commission (or elsewhere) constitute material omissions.

## VIII.    Revolution's Description of its 2017 Restructuring Charge Was Materially Misleading

114.    Largely as a result of Value's improper practice of reporting uncompleted sales as bill and hold transactions, Revolution's accounting records reflected ever-increasing dollar amounts of uncompleted sales (and corresponding non-existent accounts receivable, that is, amounts purportedly owed by customers for such uncompleted sales). Over time, these discrepancies created a variety of accounting and financial problems for Revolution, which required a large-scale correction.

115.    During the quarter ended December 31, 2017, Revolution announced that it was restructuring its business and the company recorded a $16.9 million restructuring charge. Included in the restructuring charge was a write-off of $5.6 million of Revolution's accounts receivable balance. Memos and analyses prepared by Revolution's accounting staff and reviewed by DePalma provided a misleading justification for the write-off, representing that these receivables were uncollectable because they were derived from a discontinued "custom and specialty product business" that Revolution was no longer supporting. DePalma knew or should have known this explanation was misleading, as nearly $1.5 million of the write-off related to a single customer that had never committed to a potential order that Revolution had recorded as a bill and hold transaction.

## IX.    Revolution Announces Its Financial Statements Should Not Be Relied Upon

116.    On October 17, 2018, LaPenta sent a letter to Revolution's independent board members declaring his interest to purchase all of the outstanding shares of common stock.

36

Revolution disclosed this letter in a Form 8-K filed with the Commission on October 17, 2018. In his letter, LaPenta expressed his interest in purchasing the shares at $2.00 per share, even though the stock closed the prior day at $2.56 per share. LaPenta wrote:

> While we recognize that our offer represents a discount to the current trading price of the Company's common stock, we do not believe that the current trading price accurately reflects the Company's current financial performance or liquidity situation….our offer represents the best value that the Company's stockholders could reasonably expect given the current circumstances.

LaPenta did not disclose the "current circumstances" to which he had referred. That day, Revolution's stock price closed at $1.58.

117. On October 19, 2018, Revolution issued a press release to provide "additional clarity regarding its recent preliminary third quarter results issued October 17, 2018." In that press release, Revolution disclosed for the first time that there was "an ongoing investigation by the SEC regarding certain revenue recognition practices, including bill and hold transactions that occurred between 2014 through the second quarter of 2018." Revolution also provided estimates of the net effect of the reporting of revenue from bill and hold transactions. On Friday, October 19, 2018, Revolution's stock price closed at $1.59, and on Monday, October 22, 2018, the stock price closed at $1.43.

118. On December 10, 2018, Revolution's Audit Committee concluded and publicly announced that the company's financial statements for the fiscal years ending 2015-2017 and each quarter therein, as well as the first two quarters of 2018, should no longer be relied upon.

119. By the end of 2018, Revolution's stock price had dropped to $0.40.

120. The Forms 10-K, Forms 10-Q, and Forms 8-K filed by Revolution between the end of fiscal year 2014 and the second quarter of 2018 each contained materially false and misleading financial statements with improperly reported revenue, in violation of Revolution's accounting policies and GAAP. Specifically, these filings include Forms 10-K filed with the

Commission on or about March 16, 2015, March 10, 2016, March 9, 2017, and March 8, 2018; Forms 10-Q filed with the Commission on or about May 11, 2015, August 6, 2015, November 5, 2015, May 12, 2016, August 4, 2016, November 9, 2016, May 2, 2017, July 27, 2017, October 26, 2017, May 1, 2018, and August 13, 2018; and Forms 8-K filed with the Commission on or about March 6, 2015, March 16, 2015, May 11, 2015, July 13, 2015, October 19, 2015, May 2, 2016, May 9, 2016, May 12, 2016, August 4, 2016, November 9, 2016, March 9, 2017, December 27, 2017, August 6, 2018, October 17, 2018, and October 22, 2018. In addition, these filings failed to disclose Revolution's reliance on the practice of reporting revenue from uncompleted sales it treated as bill and hold transactions and Revolution's material deviations from its publicly stated and internal revenue recognition policies and GAAP.

121. Each of these filings was materially false and misleading because the disclosure failures and improper omissions concerned sales and finance practices and are important to the reasonable investor, especially when the practices comprised such a large percentage of Revolution's business and occupied so much of Revolution's time, resources, and effort. At points, approximately 20% of a quarter's product sales remained in Revolution's warehouses at the end of the quarter due to bill and hold transactions.

122. In addition, the financial statements contained in each of these filings were misstated materially due to a variety of quantitative and qualitative factors, including but not limited to:

- the financial statements quantitatively misstated revenue, net income, and other financial statement metrics for each period reported as calculated on an iron-curtain or roll-over basis or incorporated previously misstated financial information from prior periods;

- the financial statements concealed Revolution's failure to meet publicly reported expectations for revenue and other financial statement metrics, and/or concealed the magnitude of those failures;

- the financial statements failed to disclose the effect that Revolution's improper revenue recognition would have on its ability to borrow from its bank, the amount it could borrow, and the effect that failing to meet sales and revenue forecasts would have on its ability to obtain sufficient cash for its operations; and

- the financial statements were the product of non-compliance with its own policies, the circumvention of its controls, misrepresentations made to its auditor, and fraud.

123.    LaPenta, as Revolution's CEO, and DePalma, as Revolution's CFO, signed Revolution's annual reports on Form 10-K for fiscal years 2015 through 2017, its quarterly reports on Form 10-Q for the second and third quarters of 2015 and each subsequent quarter through the second quarter of 2018, and the accompanying certifications. For each filing, LaPenta and DePalma certified that they had no knowledge of any untrue statement or omission of material fact, and that the financial statements in the reports fairly presented the financial condition and results of the issuer. At the time they made those certifications, LaPenta and DePalma knew or should have known they were false.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Revolution and Garner)

124.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 123 above as if set forth fully herein.

125.    Defendants Revolution and Garner intentionally, knowingly, or recklessly engaged in a fraudulent scheme through the series of fraudulent acts, statements, and material

39

omissions detailed above through which Revolution publicly reported more revenues than it had earned. Defendants Revolution and Garner directly or indirectly (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of Revolution's securities.

126.    As set forth above, Defendants Revolution and Garner employed devices, schemes, or artifices to defraud by fraudulently recognizing revenues from uncompleted sales by characterizing them as bill and hold transactions. They knew or were reckless in not knowing that recognizing revenues from these transactions was improper under applicable accounting rules and/or would mislead investors and lenders about the financial condition of the company. Revolution and Garner also failed to disclose Revolution's material deviations from proper revenue practices, including Revolution's own accounting policies.

127.    As detailed above, Garner knowingly or recklessly:

- Directed the efforts of Revolution personnel in converting uncompleted sales to bill and hold transactions, knowing that those sales did not meet the criteria for revenue recognition;

- Approved the recognition of revenue from uncompleted sales that did not meet the criteria for revenue recognition in Revolution's accounting policies and under GAAP, knowing that the revenue would be included in the company's public statements, filings with the Commission, and submitted to its bank; and causing those statements and filings to be materially misstated;

- Concealed details of these uncompleted sales from Revolution's auditor, including, but not limited to, the facts that the bill and hold transactions were not initiated by the customers (or in some cases, the customer had not agreed to the transaction at all), did not have fixed delivery schedules, that Revolution's performance was not complete, and that the goods sold were sometimes not in Revolution's possession or segregated prior to the recognition of revenues;

- Concealed from Revolution's auditor Revolution's efforts to obtain stored materials agreements well after the close of the fiscal quarter or fiscal year and misled the auditor about the existence of those agreements;

- Arranged for the falsification of documents relating to the transactions, knowing the documents would be viewed by the auditor.

128.    Defendants Revolution and Garner have directly or indirectly made use of the means of instrumentalities or interstate commerce, or the mails, or of the facilities of a national securities exchange, in connection with these transactions, acts, practices, and courses of business.

129.    As a result, Defendants Revolution and Garner have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Violation of Section 17(a)(1) of the Securities Act
### (Revolution and Garner)

130.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 129 above as if set forth fully herein.

131.     As detailed above, Defendants Revolution and Garner directly or indirectly, in the offer or sale of securities, using the means and instruments of transportation or communication in interstate commerce or by use of the mail, with scienter, employed devices, schemes, or artifices to defraud.

132.     As set forth above, Defendants Revolution and Garner employed devices, schemes, or artifices to defraud by fraudulently recognizing revenues from uncompleted sales by characterizing them as bill and hold transactions. They knew or were reckless in not knowing that recognizing revenues from these transactions was improper under applicable accounting rules and/or would mislead investors and lenders about the financial condition of the company. Revolution and Garner also failed to disclose Revolution's material deviations from proper revenue practices, including Revolution's own accounting policies.

133.     As detailed above, Garner knowingly or recklessly:

- Directed the efforts of Revolution personnel in converting uncompleted sales to bill and hold transactions, knowing that those sales did not meet the criteria for revenue recognition;

- Approved the recognition of revenue from uncompleted sales that did not meet the criteria for revenue recognition in Revolution's accounting policies and under GAAP, knowing that the revenue would be included in the company's public statements, filings with the Commission, and submitted to its bank; and causing those statements and filings to be materially misstated;

- Concealed details of these uncompleted sales from Revolution's auditor, including, but not limited to, the facts that the bill and hold transactions were not initiated by the customers (or in some cases, the customer had not agreed to the

transaction at all), did not have fixed delivery schedules, that Revolution's performance was not complete, and that the goods sold were sometimes not in Revolution's possession or segregated prior to the recognition of revenues;

- Concealed from Revolution's auditor Revolution's efforts to obtain stored materials agreements well after the close of the fiscal quarter or fiscal year and misled the auditor about the existence of those agreements;

- Arranged for the falsification of documents relating to the transactions, knowing the documents would be viewed by the auditor.

134. As a result, Defendants Revolution and Garner have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## THIRD CLAIM

### Violation of Section 17(a)(2) and (3) of the Securities Act
### (Revolution, LaPenta, DePalma, Garner, O'Neal)

135. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 134 above as if set forth fully herein.

136. As detailed above, Defendants Revolution, LaPenta, DePalma, Garner, and O'Neal, directly or indirectly, in the offer or sale of securities, using the means and instruments of transportation or communication in interstate commerce or by use of the mail, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or, engaged in transactions, practices, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

137. As a result, Defendants Revolution, LaPenta, DePalma, Garner, and O'Neal have violated and, unless enjoined, will continue to violate Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

## FOURTH CLAIM

### Violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder (Revolution)

138. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 137 above as if set forth fully herein.

139. Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder require an issuer such as Revolution to file with the Commission accurate annual reports on Forms 10-K, 8-K, and 10-Q respectively. Rule 12b-20 requires that these reports contain such further material information as is necessary to make the required statements in the reports not misleading.

140. As set forth above, the Form 10-Ks, Forms 10-Q, and Forms 8-K filed by Revolution between the end of fiscal year 2014 and the second quarter of 2018 each contained false and misleading financial statements with improperly reported revenue, in violation of Revolution's accounting policies and GAAP. Specifically, these filings include Forms 10-K filed with the Commission on or about March 16, 2015, March 10, 2016, March 9, 2017, and March 8, 2018; Forms 10-Q filed with the Commission on or about May 11, 2015, August 6, 2015, November 5, 2015, May 12, 2016, August 4, 2016, November 9, 2016, May 2, 2017, July 27, 2017, October 26, 2017, May 1, 2018, and August 13, 2018; and Forms 8-K filed with the Commission on or about March 6, 2015, March 16, 2015, May 11, 2015, July 13, 2015, October 19, 2015, May 2, 2016, May 9, 2016, May 12, 2016, August 4, 2016, November 9, 2016, March

9, 2017, December 27, 2017, August 6, 2018, October 17, 2018, and October 22, 2018. In addition, these filings failed to disclose Revolution's recognition of revenues from uncompleted sales it treated as bill and hold transactions and Revolution's material deviations from its publicly stated and internal revenue recognition policies and GAAP.

141. As a result, Revolution violated and, unless enjoined, will continue to violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. §§78m(a); 17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## FIFTH CLAIM

### Aiding and Abetting Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder (LaPenta, DePalma, Garner, O'Neal)

142. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 141 above as if set forth fully herein.

143. As set forth above, LaPenta, DePalma, Garner, and O'Neal each knowingly or recklessly provided substantial assistance to Revolution in its failures to file with the Commission accurate and complete information, reports, and documents, and such further material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

144. As set forth above, the Forms 10-Ks, Forms 8-K, and Forms 10-Q filed by Revolution between the end of fiscal year 2014 and the second quarter of 2018 (as listed in paragraph 140 above) each contained false and misleading financial statements which improperly reported revenue that was attributed to purported bill and hold transactions, in violation of Revolution's accounting policies and GAAP.

145.     Garner knowingly or recklessly provided substantial assistance to Revolution in its failures to file with the Commission accurate and complete information, reports and documents for each Form 10-K, Form 10-Q, or Form 8-K listed in Paragraph 140 above, which Revolution filed with the Commission prior to September 2016, and for the Form 10-K filed March 9, 2017. O'Neal knowingly or recklessly provided substantial assistance to Revolution in its failures to file with the Commission accurate and complete information, reports and documents for each Form 10-K, Form 10-Q, or Form 8-K listed in Paragraph 140 above, which Revolution filed with the Commission after November 2016.

146.     As a result, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78(t)(e)], Defendants LaPenta, DePalma, Garner, and O'Neal each aided and abetted, and unless enjoined will continue to aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## SIXTH CLAIM

### Violation of Section 13(b)(2)(A) of the Exchange Act
### (Revolution)

147.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 146 above as if set forth fully herein.

148.     Section 13(b)(2)(A) of the Exchange Act requires an issuer such as Revolution to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets.

149.     By failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets, Revolution violated

and, unless enjoined, will continue to violate Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SEVENTH CLAIM

### Aiding and Abetting Violations of
### Section 13(b)(2)(A) of the Exchange Act
### (LaPenta, DePalma, Garner, O'Neal)

150. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 149 above as if set forth fully herein.

151. As set forth above, through their conduct LaPenta, DePalma, Garner, and O'Neal each knowingly or recklessly provided substantial assistance to Revolution in its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

152. As a result, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants LaPenta, DePalma, Garner, and O'Neal aided and abetted, and unless enjoined, will continue to aid and abet, violations of Sections 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## EIGHTH CLAIM

### Violation of Section 13(b)(2)(B) of the Exchange Act
### (Revolution)

153. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 152 above as if set forth fully herein.

154. Section 13(b)(2)(B) of the Exchange Act requires an issuer such as Revolution to devise and maintain a system of internal accounting controls sufficient to provide reasonable

assurances that its financial statements are prepared in conformity with GAAP or any other criteria applicable to those statements.

155.    As set forth above, the financial statements in the Forms 10-K, 10-Q, and 8-K listed above in paragraph 140 recognized revenue in ways that did not comply with GAAP and that had a material impact on the company's financial results.

156.    As a result, Revolution violated and, unless enjoined, will continue to violate Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## NINTH CLAIM

### Aiding and Abetting Violations of
### Section 13(b)(2)(B) of the Exchange Act
### (LaPenta, DePalma, Garner, O'Neal)

157.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 156 above as if set forth fully herein.

158.    As set forth above, through their conduct described above and by failing to ensure that sufficient accounting controls existed, LaPenta, DePalma, Garner, and O'Neal knowingly or recklessly provided substantial assistance to Revolution in its failure to devise and maintain internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability for assets.

159.    As a result, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants LaPenta, DePalma, Garner, and O'Neal aided and abetted, and unless enjoined, will continue to aid and abet, violations of Sections 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B).

## TENTH CLAIM

### Violation of Section 13(b)(5) of the Exchange Act
### (DePalma, Garner, O'Neal)

160. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 159 above as if set forth fully herein.

161. Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or from knowingly falsifying any book, record, or account.

162. As set forth above, Defendants DePalma, Garner, and O'Neal knowingly circumvented and/or knowingly failed to implement a system of internal accounting controls at Revolution, and directly or indirectly, knowingly falsified, or caused, through the conduct described above to be falsified, Revolution's books, records, and/or accounts.

163. As a result, Defendants DePalma, Garner, and O'Neal violated and, unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. §§78m(b)(5)].

## ELEVENTH CLAIM

### Violations of Exchange Act Rule 13b2-1
### (LaPenta, DePalma, Garner, O'Neal)

164. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 163 above as if set forth fully herein.

165. As set forth above, Defendants LaPenta, DePalma, Garner, and O'Neal, directly or indirectly, falsified or caused to be falsified Revolution's books, records, and/or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

166.     As a result, Defendants LaPenta, DePalma, Garner, and O'Neal violated, and unless enjoined, will continue to violate Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R. § 240.13b2-1].

## TWELFTH CLAIM

### Violation of Exchange Act Rule 13b2-2
### (Garner)

167.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 166 above as if set forth fully herein.

168.     As set forth above, Defendant Garner, who was an officer of Revolution and who acted under the direction of Revolution's Chief Financial Officer DePalma, directly or indirectly, made or caused to be made materially false or misleading statements or omitted to state or caused another to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with an audit or examination of the financial statements of Revolution.

169.     As set forth above, Defendant Garner directly or indirectly took action to coerce, manipulate, mislead, or fraudulently influence Revolution's independent auditor (which was a certified public accountant and/or public accountant) in the performance of audits and reviews of the financial statements of Revolution that are required to be filed with the Commission, knowing that, if successful, such action could make the issuer's financial statements materially misleading.

170.     As a result, Defendant Garner violated, and unless enjoined, will continue to violate Rule 13b2-2 promulgated under the Exchange Act [17 C.F.R. § 240.13b2-2].

# THIRTEENTH CLAIM

## Violations of Exchange Act Rule 13a-14
### (LaPenta and DePalma)

171.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 170 above as if set forth fully herein.

172.    As set forth above, Defendants LaPenta and DePalma each falsely certified, pursuant to Section 301 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14, Revolution's quarterly and annual reports listed below. LaPenta and DePalma violated Rule 13a-14 because they signed certifications for Revolution's public filings that failed to disclose Revolution's use of bill and hold transactions and deviation from its revenue recognition policy and misstated Revolution's revenue during the proposed restatement period. LaPenta falsely certified paragraph 2 in the certification to the Form 10-K for fiscal year 2014 and all subsequent annual and quarterly filings through the Form 10-Q filed for the second quarter of 2018. DePalma falsely certified paragraphs 2 and 3 in the certification to the Form 10-Q for the second quarter of 2015 (the quarter ended June 30, 2015) and all subsequent annual and quarterly filings through the Form 10-Q filed for the second quarter of 2018.

173.    Each stated that he had reviewed each report and that based upon his knowledge, the reports did not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which those statements were made, not misleading. Each also certified that, based upon his knowledge, the financial statements, and information contained in the reports fairly presented, in all material respects, Revolution's financial condition, results of operations, and cash flows.

174.    The reports that Defendants LaPenta and DePalma certified contained untrue statements of material fact and omitted to state material facts necessary to make the statements therein, in light of the circumstances under which the statements were made, not misleading.

175.    As a result, Defendants LaPenta and DePalma violated, and unless restrained will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 204.13a-14].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter permanent injunctions, including an injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, as follows:

    a.  For Revolution:  conduct in violation of Section 17(a) of the Securities Act [15 U.S.C.S § 77q(a)], and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b),78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13];

    b.  For LaPenta:  conduct in violation of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C.S § 77q(a)(2) & (3)] and Rules 13a-14 and 13b2-1 promulgated under the Exchange Act [17 C.F.R. §§ 240.13a-14 & 240.13b2-1], and aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 12b-20, 13a-1,

13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

c. For DePalma: conduct in violation of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C.S § 77q(a)(2) & (3)], and Section 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 13a-14 and 13b2-1 promulgated under the Exchange Act [17 C.F.R. §§ 240.13a-14, 240.13b2-1], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13]

d. For Garner: conduct in violation of Section 17(a) of the Securities Act [15 U.S.C.S § 77q(a)], and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 promulgated under the Exchange Act [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2], and aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13];

e. For O'Neal: conduct in violation of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C.S § 77q(a)], and Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R. §§ 240.13b2-1], and aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B) [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1,

240.13a-11, and 240.13a-13];

B.    Prohibit pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] Defendant Garner from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o].

C.    Require Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

D.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and,

E.    Award other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Marc Jones
Marc J. Jones (Mass. Bar No. 645910)
  Senior Trial Counsel
Peter Bryan Moores (Mass. Bar No. 658033)
  Senior Enforcement Counsel
Michele T. Perillo (Mass. Bar No. 629343)
  Assistant Director
Martin F. Healey (Mass. Bar No. 227550)
  Regional Trial Counsel

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8947 (Jones direct)
jonesmarc@sec.gov (Jones email)

*Local Counsel*:
John B. Hughes (Fed. Bar No. CT 05289)

Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373 (fax)

DATED: September 24, 2020